Amy HUSS, Appellant

v.

James P. WEAVER, Appellee.

Superior Court of Pennsylvania.

Argued Oct. 15, 2015.

Filed Feb. 5, 2016.

Charles E. Kurowski, Washington, for appellant.

Mari Ann Hathaway, Washington, for appellee.

BEFORE: GANTMAN, P.J., BENDER, P.J.E., BOWES, J., PANELLA, J., SHOGAN, J., LAZARUS, J., OTT, J., STABILE, J., and JENKINS, J.

OPINION BY BENDER, P.J.E.:

Amy Huss ("Huss") appeals from the September 25, 2013 order sustaining preliminary objections filed by James P. Weaver ("Weaver") in response to Huss' contract action against Weaver. For the reasons that follow, we reverse.

In October 2008, Huss and Weaver, who were involved in a romantic relationship, entered into a contract ("Agreement") in which they agreed that if their relationship resulted in the birth of a child, Huss would have primary physical custody and Weaver would have specified visitation rights, and that if Weaver sought court modification of these terms he would pay Huss $10,000 for each such attempt. The parties had a son in November 2010 and Weaver filed a complaint for custody in December 2010.

Huss then filed a complaint alleging 'that Weaver had failed to abide by his contractual promise to make the required $10,000 payments.

Specifically, Huss filed her initial complaint on March 7, 2013, alleging a single count for breach of contract. In response to the preliminary objections filed by Weaver, on April 19, 2013, Huss filed an amended complaint, adding causes of action for negligent misrepresentation and fraud. On May 7, 2013, Weaver filed preliminary objections in the nature of demurrers to the amended complaint, asserting that the $10,000 modification provision of the Agreement violated public policy and that the negligent misrepresentation and fraud causes of action were barred by the economic loss doctrine. On September 25, 2013, the trial court entered the order now on appeal and an accompanying opinion, sustaining Weaver's preliminary objections and dismissing Huss' amended complaint with prejudice.

In her amended complaint, Huss alleged that the parties entered into the Agreement on October 17, 2008, that at that time Weaver was a practicing attorney with the law firm of Buchanan Ingersoll & Rooney in Pittsburgh, and that he had provided Huss with "legal representation in various legal matters." Amended Complaint, 4/19/13, at ¶¶ 3–6. Huss further alleged that Weaver, along with a colleague at the Buchanan Ingersoll & Rooney law firm, drafted the Agreement. *Id.* at ¶ 5. The relevant provisions of the Agreement state as follows:

> WHEREAS, currently [Huss] is a real estate agent capable of earning large commissions if she works excessive hours and [Weaver] is an attorney capable of earning a large salary; and
> WHEREAS, in the event that [Huss] has a child or children of [Weaver] and the parties' relationship is ended by either party, whether or not the parties are married at the time of the termination of the relationship, the parties desire to set forth their agreement as to the custody of such child or children. NOW THEREFORE the parties for and in consideration of the covenants contained in the Agreement, and intending to be legally bound thereby, agree as follows:
>
> 1. *Custody.* In the event that either [Weaver] or [Huss] terminates the relationship with the other, whether or not they are married at the time of such termination, the legal custody of any child by this Agreement shall be shared by [Weaver] and [Huss] shall have primary physical custody of such children. In the event such termination of the relationship occurs, [Weaver] agrees that he will not pursue full physical custody of any child by this agreement and further agrees that he will not attempt to use the fact that [Huss] must work excessive hours selling real estate in order to earn large commissions to pursue custody of such child or children.
>
> 2. *Visitation.* In the event that either [Weaver] or [Huss] terminates the relationship with the other, whether they are married at the time of such termination, [Weaver] shall be entitled to unsupervised visitation with any child by this Agreement as follows:
>
> a. So long as the parties reside within 50 miles of one another, [Weaver] shall be entitled to every other weekend beginning a 7 p.m. Friday evening and ending 4 p.m. Sunday evening. [Weaver] agrees to be responsible for transportation.
>
> b. In the event that the parties reside more than 50 miles from one another, [Weaver] shall be entitled to one month during the summer as agreed to by the parties.

c. [Huss] has the right to relocate out of state if she desires.

3. *Support.* [Weaver] agrees that, regardless of any custody arrangement between the parties, [Weaver] waives any rights to pursue [Huss] for child support for any child. [Weaver] further agrees to pay [Huss] child support for any child or children to be agreed upon by the parties or determined by Domestic Relations.

4. *Modification of Agreement.* This Agreement may only be modified or amended by the parties by a written instrument signed by both [Weaver] and [Huss]. The parties acknowledge that this Agreement may be modified or superseded by a court of competent jurisdiction. **In the event that [Weaver] files a complaint, motion, petition or similar pleading seeking the modification or amendment of the custody and/or visitation provisions set forth herein, [Weaver] agrees to pay [Huss] $10,000 for each modification or amendment sought.**

5. *Voluntary Agreement.* Each party understands that in the absence of this Agreement, as a matter of law, that he or she might be entitled to a greater level of custody or more visitation than is provided herein. Both parties acknowledge that they have read this Agreement carefully and thoroughly, and each considers the provisions of this Agreement to be fair, just and reasonable, and that they fully understand each of its provisions and are executing the same freely and voluntarily, without coercion or other compulsion.

*Id.* at ¶ 3 (Exhibit A) (emphasis added).

Huss also alleged in her amended complaint that Weaver had breached the highlighted portion of paragraph 4 of the Agreement. She noted that, since the birth of their son, the parties have been "embroiled in litigation" regarding custody and visitation issues, that Weaver filed numerous "complaints, motions, petitions, and/or similar pleadings," and that he failed and refused to pay her $10,000 for each such filing. *Id.* at ¶¶ 9–12. Finally, Huss contended that Weaver, as her legal advisor, either negligently or intentionally misrepresented to her that she should enter into the Agreement, which "she in fact did not wish to enter," and that he never indicated to her that he believed any of its provisions to be against public policy. *Id.* at ¶¶ 14–19, 28–32.

The trial court dismissed Huss' complaint, ruling that the provision for the $10,000 payments was void as against public policy. In its written opinion in support of its sustaining of Weaver's preliminary objections, the trial court first cited cases holding that parents may not bargain away their child's right to receive child support. Trial Court Opinion, 9/25/13, at 2 (citing *Knorr v. Knorr,* 527 Pa. 83, 588 A.2d 503, 505 (1991)). The trial court then noted that custody agreements between parents are subject to court modification in the best interests of the child. *Id.* (citing *Mumma v. Mumma,* 380 Pa.Super. 18, 550 A.2d 1341, 1343 (1988)). Based on these tenets, the trial court reasoned as follows:

Imposing a fee upon [Weaver] to pay $10,000 if he decides to file a modification of child custody is against the public policy of assuring continuing contact between child and parent. It substantially impairs the Court's power and the Commonwealth's duty to determine what is in a child's best interest. "Our paramount concern in child custody matters is the best interests of the children." *Yates v. Yates,* 963 A.2d 535, 539 (Pa.Super.2008). It is against public policy to impose a fee on one party in order to determine the best interests of the child.

*Id.* at 2–3.[1]

Huss filed a notice of appeal and the case was assigned to a three-judge panel of this Court. Following the panel's review, it determined that the trial court's ruling with respect to the $10,000 clause was in error, *i.e.,* the Agreement was not unenforceable as against public policy. Thus, the trial court's sustaining of Weaver's preliminary objections was overturned. *See Huss v. Weaver,* 2014 PA Super 238 (Pa.Super. filed October 21, 2014). Weaver then filed a timely application for reargument before the court *en banc,* which was granted by *per curiam* order, dated December 12, 2014. Thus, the panel decision was withdrawn on December 12, 2014.

Following the submission of briefs for the *en banc* argument, Huss filed an application to strike Weaver's substituted brief, averring that it violated various rules of appellate procedure, because it included a recitation of numerous facts that were not a part of the record on appeal. The application to strike was deferred to this *en banc* merits panel for resolution. *See* Superior Court Orders, 2/4/15, 8/24/15. Although we recognize, and Weaver acknowledges, that some of the facts he references in his brief are not of record, we will not strike his brief. Rather, because our standard of review limits what we may consider in reaching our decision here, we are able to address Huss' issues without consideration of any facts not contained in the complaint and the attached Agreement. *See Martin v. Rite Aid of Pennsylvania,* 80 A.3d 813 (Pa.Super.2013).

Huss raises the following issues for our review:

1. Did the lower court err in concluding that the parties' Agreement was not enforceable as a matter of public policy?

2. Whether [Weaver, an attorney] who drafted a contract should be estopped from asserting the contract is unenforceable when he advised [Huss] the contract was legal and enforceable?

Huss' Brief at 3.

 Before addressing Huss' issues, we note that we are guided by the following:

In reviewing a trial court's grant of preliminary objections, the standard of review is *de novo* and the scope of review is plenary. The salient facts are derived solely from the complaint and pursuant to that standard of review, the court accepts all well-pleaded material facts in the complaint, and all inferences reasonably deduced therefrom must be accepted as true.

*Martin,* 80 A.3d at 814 (quoting *Keller v. Scranton City Treasurer,* 29 A.3d 436, 443 n. 12 (Pa.Cmwlth.2011) (internal citations omitted)).

 Huss' first issue on appeal requires us to determine whether the above highlighted "$10,000 clause" is unenforceable as against public policy. In *Ferguson v. McKiernan,* 596 Pa. 78, 940 A.2d 1236 (2007), our Supreme Court instructed us on the proper legal standards to apply when deciding such issues:

In assessing whether a contractual agreement violates public policy

1. The trial court also indicated that the provision in paragraph 3 of the Agreement preventing Weaver from filing for child support from Huss if he is ever awarded custody violates public policy. *Id.* at 2. In her present action, however, Huss is not attempting to enforce this provision and thus its enforceability is not at issue here. Moreover, its enforceability should have no effect on the issues currently ripe for resolution, since the Agreement contains a severability clause providing that if any of its provisions are determined to conflict with Pennsylvania law, "the remaining terms of this Agreement shall remain in full force and effect." Amended Complaint, 4/19/13, at ¶ 3 (Exhibit A, ¶ 7).

this Court is mindful that public policy is more than a vague goal which may be used to circumvent the plain meaning of the contract. *Hall v. Amica Mut. Ins. Co.*, 538 Pa. 337, 347, 648 A.2d 755, 760 (1994) [. . . .]

> Public policy is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interest. As the term 'public policy' is vague, there must be found definite indications in the law of the sovereignty to justify the invalidation of a contract as contrary to that policy. . . . Only dominant public policy would justify such action. In the absence of a plain indication of that policy through long governmental practice or statutory enactments, or of violations of obvious ethical or moral standards, the Court should not assume to declare contracts . . . contrary to public policy. The courts must be content to await legislative action.

*Id.* at 347–48, 648 A.2d at 760 (citations omitted). This Court has further elaborated that:

> It is only when a given policy is so obviously for or against the public health, safety, morals or welfare that there is a virtual unanimity of opinion in regard to it, that a court may constitute itself the voice of the community in so declaring [that the contract is against public policy].

*Mamlin v. Genoe*, 340 Pa. 320, 325, 17 A.2d 407, 409 (1941).

*Ferguson*, 940 A.2d at 1245 n. 16 (quoting *Eichelman v. N'wide Ins. Co.*, 551 Pa. 558, 711 A.2d 1006, 1008 (1998)).

■ Contrary to the decision reached by the trial court, we have not identified any "dominant public policy" grounded in governmental practice, statutory enact-

ments, or violations of obvious ethical or moral standards, which provides a basis for declaring the "$10,000 clause" in the Agreement to be unenforceable as against public policy. The trial court grounded its analysis on *Knorr*, in which our Supreme Court held that parents have no power to "bargain away the rights of their children," and that if an agreement between parents for child support provides "less than required or less than can be given," courts may ignore the agreement and require a satisfactory level of support. *Knorr*, 588 A.2d at 505. Subsequent to *Knorr*, this Court has routinely held that a child's right to adequate support payments cannot be bargained away and that any release or compromise on child support obligations is invalid if it prejudices the child's welfare. *See, e.g., Sams v. Sams*, 808 A.2d 206, 211 (Pa.Super.2002); *Ruth F. v. Robert B.*, 456 Pa.Super. 398, 690 A.2d 1171, 1172 (1997); *Hyde v. Hyde*, 421 Pa.Super. 415, 618 A.2d 406, 408 (1992).

■ However, no similar appellate authority exists with respect to agreements between parents regarding custody and visitation. While custody and visitation agreements are always subject to modification by the courts in the best interests of the child, *Mumma*, 550 A.2d at 1343, we are unaware of any cases in which Pennsylvania courts have declared such contracts to be unenforceable as against public policy. The reason for this distinction would appear to be obvious, since the right to child support **belongs to the child**, and thus cannot be "bargained away" by the parents. *See Kesler v. Weniger*, 744 A.2d 794, 796 (Pa.Super.2000) ("[T]he right to support is a right of the child, not the mother or father . . . ."). Accordingly, when the parents agree among themselves to provide an inadequate level of child support, the child's rights have been violated and thus the agreement may be de-

clared void as against public policy. *See, e.g., Sams,* 808 A.2d at 213 ("[T]he agreement [is] invalid on public policy grounds, because Mother had no power to bargain away her children's right to support by reducing Father's obligation from $3,400/month support to $1,000/month.").

■ Rights to custody and visitation, on the other hand, belong to the parents (or guardians). 23 Pa.C.S. § 5322; Pa.R.C.P. 1915.1(b). Because children are not mere chattel, agreements regarding custody and visitation are always subject to court review and adjustment in the best interests of the child. *Mumma,* 550 A.2d at 1343; *Com. ex rel. Veihdeffer v. Veihdeffer,* 235 Pa.Super. 447, 344 A.2d 613, 614 (1975) ("A child cannot be made the subject of a contract with the same force and effect as if it were a mere chattel. . . ."). In no way, however, do custody and visitation agreements involve the bargaining away of the rights of the children, and accordingly they are not unenforceable as against public policy on the same basis as are agreements regarding child support. *See generally Lee v. Child Care Service Delaware County,* 461 Pa. 641, 337 A.2d 586, 590 (1975) ("Pennsylvania precedents merely provide that contracts for custody of children will not foreclose a court from making a contrary disposition in the best interests of the child. This doctrine does not support appellants' claim that 'placement agreements' are void as against public policy.").

The trial court nevertheless concluded that the "$10,000 clause" is unenforceable as against public policy because it "substantially impairs the Court's power and the Commonwealth's duty to determine what is in a child's best interests." Trial Court Opinion, 9/25/13, at 2–3. To this end, in its written opinion, the trial court refers to the "10,000 clause" as a "fee," an "impediment," an "impairment," and would

have a "chilling effect" on the filing of custody complaints or modification petitions. *Id.* at 2–5. In support of this position, in his appellate brief Weaver cites this Court's decision in *Kraisinger v. Kraisinger,* 928 A.2d 333 (Pa.Super.2007), a case in which we struck down as invalid a provision in a child support agreement requiring the mother to pay the father's legal fees if she challenged the amount of child support set forth in their agreement. *Id.* at 345. The parties' agreement specifically provided that the attorneys' fees provision was included to "discourage frivolous filings." *Id.* at 337. In accord with the rationale employed in the above-discussed child support cases, we concluded that "[w]e cannot tolerate a provision which penalizes a parent for pursuing her children's rights." *Id.* at 345.

The issue of whether a provision in a custody/visitation contract that places a serious impediment on either party's ability to seek court modification in the best interests of the child is not presently before this Court. No language in the Agreement at issue here provides either that the "$10,000 clause" is intended to discourage Weaver from seeking court intervention, or evidences that the payment would act as an impediment to his ability to do so. Whether the "$10,000 clause" would act as an impediment would depend, first and foremost, upon Weaver's financial ability to pay it. In the Agreement, however, Weaver plainly acknowledged that he "is an attorney capable of earning a large salary." Amended Complaint, 4/19/13, (Exhibit A). He also straightforwardly recognized that all of the terms of the Agreement (including the "$10,000 clause" in the immediately preceding paragraph) are "fair, just and reasonable." *Id.* at ¶ 5. Finally, Weaver agreed that he fully understood each of the Agreement's provisions and executed it "freely and voluntari-

ly, without coercion or other compulsion." *Id.*

As set forth above, our standard of review in this circumstance provides that the salient facts must be derived solely from Huss' amended complaint (including the attached Agreement), and that we must treat all well-pleaded material facts in the amended complaint, and all inferences reasonably deduced therefrom, as true. *Martin*, 80 A.3d at 814. No facts of record support a finding that the "$10,000 clause" constituted an impediment to Weaver's ability to seek court modification of any of the terms of the Agreement.

 Huss contends that the "$10,000 clause" was intended as a "defense fund" in the event of litigation regarding the Agreement. Huss' Brief at 12. While we agree with the trial court that the Agreement contains no specific language to support this suggestion, we cannot also agree that the parol evidence rule would bar her from testifying about her understanding of the parties' intentions with respect to this payment. *See, e.g., Steuart v. McChesney*, 498 Pa. 45, 444 A.2d 659, 663 (1982) (explaining that parol evidence is admissible to explain, clarify, and resolve ambiguities). Whether the parties intended to provide Huss with a "defense fund" to assist with the cost of any future litigation may depend upon the parties' relative abilities to afford the expense of any such future litigation. In this regard, the first "WHEREAS" clause in the Agreement is ambiguous, as it leaves their relative financial capabilities unclear. Weaver is described as an attorney "capable of earning a large salary," while Huss is a real estate agent "capable of earning large commissions *if she works excessive hours.*" Amended Complaint, 4/19/13, (Exhibit A) (emphasis added). Without parol evidence, we cannot ascertain whether this provision intended to convey that the parties have approximately the same capabilities to earn large salaries/commissions, or alternatively if Weaver is best able to earn more money (since he apparently can do so without working excessive hours, which arguably would be difficult for Huss to do after the birth of their child).[2] In short, whether the parties recognized Weaver's superior ability to finance the cost of future litigation, and thus provided for a "defense fund" in the Agreement, is not clear.

For these reasons, we conclude that the trial court erred in ruling that the "$10,000 clause" in the Agreement is unenforceable as against public policy. The record does not reflect that this provision constitutes any limitation on Weaver's ability to seek court intervention to modify the custody and/or visitation provisions in the Agreement between these parties in the best interests of the child.

The trial court dismissed Huss' claims for negligent misrepresentation and fraud because she "cannot point to any real damages." Trial Court Opinion, 9/25/13, at 5. However, based upon our ruling here that the "$10,000 clause" is not unenforceable as against public policy, damages for Weaver's breach of this provision may be available to Huss. As a result, dismissal of these causes of action on demurrers was also error.[3]

---

**2.** In her amended complaint, Huss alleges that Weaver drafted the Agreement. Amended Complaint, 4/19/13, at ¶ 5. Ordinary principles of contract interpretation provide that ambiguities are to be construed against the drafter, *Insurance Adjustment Bureau, Inc. v. Allstate Ins. Co.*, 588 Pa. 470, 905 A.2d 462, 468 (2006), further strengthening Huss' contention that the "$10,000 clause" was intended as a defense fund.

**3.** In light of our disposition of Huss' first issue on appeal, it is not necessary to address her second issue.

Order reversed. Case remanded. Jurisdiction relinquished.

President Judge GANTMAN and Judges PANELLA, LAZARUS, OTT and STABILE join this opinion.

Judge BOWES files a concurring opinion in which Judges SHOGAN, LAZARUS and STABILE join.

Judge SHOGAN concurs in the result of the majority opinion.

Judge JENKINS files a dissenting opinion.

## CONCURRING OPINION BY BOWES, J.:

I concur with the learned majority insofar as it concludes that the trial court erred in sustaining the preliminary objections in the nature of a demurrer filed by James P. Weaver ("Father") and dismissing the amended complaint for breach of contract, wherein Amy Huss ("Mother") sought to enforce monetary aspects of a child custody agreement. Stated plainly, I agree that the agreement is not contrary to public policy *per se.* I write separately, however, because I believe that, while Mother's amended complaint is legally sufficient to survive preliminary objections, it is premature to opine as to whether the provision is enforceable in this case.

Herein, the trial court sustained Father's preliminary objections in the nature of a demurrer and dismissed Mother's amended complaint. Father's preliminary objections characterized the $10,000 payment as a penalty. Mother countered that the parties intended for the payments to form the *corpus* of a defense fund that reflected a reasonable approximation of the expected costs of litigation if Father initiated further custody proceedings. The trial court adopted Father's perspective that the fee was a penalty. The court

reasoned, "The provision … penalizing only the Father if he files any custody or visitation petition clearly violates public policy and is unenforceable. Thus, the complaint is legally insufficient and a demurrer is granted." Trial Court Opinion and Order, 9/25/13, at 6.

At the outset, I reiterate the appropriate standard of review of an order sustaining a demurrer as follows:

When reviewing the dismissal of a complaint based upon preliminary objections in the nature of a demurrer, we treat as true all well-pleaded material, factual averments and all inferences fairly deducible therefrom. Where the preliminary objections will result in the dismissal of the action, the objections may be sustained only in cases that are clear and free from doubt. To be clear and free from doubt that dismissal is appropriate, it must appear with certainty that the law would not permit recovery by the plaintiff upon the facts averred. Any doubt should be resolved by a refusal to sustain the objections. Moreover, we review the trial court's decision for an abuse of discretion or an error of law.

*B.N. Excavating, Inc. v. PBC Hollow–A, L.P.,* 71 A.3d 274, 277–278 (Pa.Super.2013) (citations omitted) (*en banc*). "A demurrer should be sustained only when the complaint is clearly insufficient to establish the pleader's right to relief." *Id.* at 278.

In order to review Father's demurrer properly, the trial court was required to determine whether the law precluded recovery notwithstanding Mother's well-pleaded factual averments and all reasonable inferences that could be drawn therefrom. Instantly, Mother's complaint averred, *inter alia,* that: 1) she and Father entered an accord wherein he agreed to pay her $10,000 each time that he filed a document seeking to modify or amend the

custody arrangement; 2) Father, a lawyer, helped draft the agreement and had the financial means to satisfy the payment provision; 3) Father filed numerous pleadings seeking to modify custody but failed to pay the negotiated fee; and 4) Mother incurred damages as a result of Father's breach of contract.

The custody accord, which Mother attached to the amended complaint as Exhibit A, provided, in pertinent part, as follows:

> WHEREAS, currently [Mother] is a real estate agent capable of earning large commissions if she works excessive hours and [Father] is an attorney capable of earning a large salary[.]
>
> ....
>
> 4. *Modification of Agreement.* This Agreement may only be modified or amended by the parties by a written instrument signed by both [Father] and [Mother]. The parties acknowledge that this Agreement may be modified or superceded [sic] by a court of competent jurisdiction. In the event that [Father] files a complaint, motion, petition or similar pleading seeking the modification or amendment of the custody and/or visitation provisions set forth herein, [he] agrees to pay [Mother] $10,000 for each modification or amendment sought.

Amended Complaint, 4/19/13, Exhibit A.

A proper evaluation of Father's preliminary objections is limited to the foregoing factual averments and all reasonable inferences that flow from those facts. While the trial court referenced the appropriate standard of review, in reality, it disregarded Mother's well-pleaded averments and elevated Father's unsupported assertion that the fee arrangement was actually a penalty provision. However, since neither Mother's amended complaint nor Exhibit A indicates that the payments were penalties, the trial court committed reversible error in distorting its review of the pleadings in order to reach a contrary conclusion. *See B.N. Excavating, Inc., supra* at 278 (trial court committed reversible error where it "based its decision ... upon a single disputed averment in Appellees' preliminary objections.").

Instantly, the four corners of the custody accord do not establish whether the $10,000 payments were intended either as penalties or a defense fund. The agreement simply does not disclose the intended purpose of the payments. Moreover, nothing in the amended complaint or custody accord revealed, much less suggested, that the fee provision was crafted as a penalty or as an impediment to Father's ability to litigate custody arrangements. Rather, the amended pleading and attached exhibit indicated that Father, a lawyer, both participated in drafting the provision that established the fee and had sufficient financial resources to pay it. Accordingly, mindful that the correct analysis is limited to Mother's amended complaint and the attached exhibit, I agree with the learned majority that the trial court erred in sustaining Father's preliminary objections to Mother's amended complaint on the basis that the fee provision was facially unenforceable as contrary to public policy. At this juncture in the litigation, it does not appear with certainty that the law would preclude Mother from recovery based upon the facts averred.

While the majority does not state it expressly, it intimates that the fee provision is enforceable. In its summation, the majority concludes, "based on our ruling here that the '$10,000 clause' is not unenforceable as against public policy, damages for [Father's] breach of this provision may be available to [Mother]." Majority Opinion at 14. However, in my opinion, it is premature for this Court to uphold the enforceability of this clause without first

reviewing the intent of the parties as it relates to the fee provision. As Judge Jenkins outlines in her dissenting opinion, it is beyond peradventure that children have rights in custody disputes, and the best interest of the child is the paramount consideration in all custody litigation. Dissenting Opinion at 461–62 (collecting cases). Furthermore, a parent's custodial rights are inferior to a child's right to live in an environment that provides for his or her best interest. *Id.* at 462 n. 2.

For the reasons expressed by the trial court and highlighted by the learned dissent, the agreement to assess Father $10,000 per filing might, in fact, constitute a penalty or at least impermissibly inhibit the legitimate exercise of Father's legal rights depending upon facts and circumstances that have not yet been fully divulged through discovery. Although Mother's current assertions that the fee is not penal in nature and that Father had the resources to pay it are sufficient to survive Father's demurrer, as the case proceeds, facts may reveal the provision as a penalty or contrary to public policy based upon its chilling effect. Without a doubt, to the extent that a parent who seeks to achieve the child's best interest by utilizing the court system lacks financial resources to pay the agreed-upon fee, the impediment to that parent's ability to seek redress would be unenforceable as contrary to public policy. *See Wick v. Wick,* 266 Pa.Super. 104, 403 A.2d 115, 116 (1979) ("The person having custody of a child should be permitted access to the courts whenever necessary to protect the child's welfare.").

Although not established by the four corners of the instant accord, the trial court's characterization of an agreed-upon payment as a penalty, impairment, or impediment may prove accurate as discovery proceeds. For example, if the fee creates a significant financial burden, the required payment of $10,000 could constitute a penalty, or at least, an intractable barrier that inhibits the legitimate exercise Father's right to seek the trial court's determination of the child's best interest. Additionally, situations may materialize within the custodial parent's household that increase the risk of harm to the child in that environment, *e.g.,* domestic violence, drug abuse, or the habitation of a person who presents a danger to the child. The emergence of any of these conditions may be grounds for a trial court to modify a custody agreement in pursuit of the child's best interest. However, before a trial court can confront that issue within the parameters of a private custody dispute, the matter has to be raised by a person with standing, *i.e.,* the noncustodial parent. Absent the capacity to file a motion to modify the custody order without concern for an ability to satisfy the fee outlined in an agreement, the matter of the child's best interest never comes before the trial court, and the child's best interest is not achieved. This is the particular harm that the trial court was attempting to avoid herein.

Conversely, however, the fee might, in fact, reflect a reasonable defense fund that protects one parent against excessive or vexatious litigation initiated by a parent with vastly superior financial resources. In this situation, where the intent is to place the litigants on relatively equal footing, a fee of $10,000 may well be reasonable depending on the parent's relative financial means. It certainly is not contrary to public policy to provide a disadvantaged litigant equal access to the court or protect him or her from abusive litigation. Both of these concepts provide a firm basis upon which the courts can ascertain the child's best interest.

The current facts and procedural posture of this case supply an inadequate basis for either the trial court's determination that this type of provision is fundamentally contrary to public policy or the majority's suggestion that the $10,000 fee is enforceable. Several factors exist that the trial court was unable to contemplate in this case due to the procedural posture of the matter and the fact that its review was limited to Mother's pleadings. Prior to reaching the ultimate decision regarding enforceability, a determination must first be made in consideration of the dynamics of this precise agreement vis-à-vis the parties' intentions and each person's relative financial status. Only then, after full deliberation, should the trial court determine the provision's enforceability.

Accordingly, for the foregoing reasons, I concur with the majority's decision to reverse the trial court order that sustained Father's preliminary objections to Mother's amended complaint. However, in my view, it is premature to confront the ultimate determination regarding whether the fee provision is, in fact, enforceable under the procedural posture of this case. Unlike my esteemed colleagues, I would unambiguously limit the holding in this case to the record before the trial court at this time.

Judges SHOGAN, LAZARUS and STABILE join this Concurring Opinion.

DISSENTING OPINION BY JENKINS, J.:

I respectfully dissent. I would affirm the trial court's order sustaining James P. Weaver's preliminary objections and dismissing Amy Huss's complaint seeking enforcement of the parties' agreement. Although rights involving child custody and visitation belong to the parents, these rights are limited to those which serve the best interest of the child. A child has a right to a custody arrangement that meets his or her best interests. In my view, a contractual provision that potentially hinders or chills an interested party's ability to ensure a custody arrangement that is in the child's best interest is against public policy and unenforceable.

In October 2008, Huss and Weaver entered into a contract ("Agreement") which outlined the custody and visitation rights of their potential future children. The Agreement provided that if Weaver sought to modify the contract terms, he would be required to "pay Huss $10,000.00 for each modification or amendment sought." Amended Complaint, 4/19/13, at ¶ 3 (Exhibit A).

In November of 2010, the parties' son was born. In December 2010, Weaver filed a complaint for custody. In March 2013, Huss filed a complaint alleging Weaver breached the 2008 contract. Weaver filed preliminary objections. Huss filed an amended complaint and Weaver filed preliminary objections to the amended complaint arguing, *inter alia*, that the provision requiring Weaver to pay Huss $10,000.00 for each modification or amendment of custody sought violated public policy. The trial court granted Weaver's preliminary objections and dismissed Huss's complaint. The majority reverses this determination.

In *Knorr v. Knorr*, the Pennsylvania Supreme Court held:

Parties to a divorce action may bargain between themselves and structure their agreement as best serves their interests, [*Brown v. Hall*, 495 Pa. 635, 435 A.2d 859 (1981)]. They have no power, however, to bargain away the rights of their children, [*Sonder v. Sonder*, 378 Pa.Super. 474, 549 A.2d 155 (1988)]. Their right to bargain for themselves is their own business. They cannot in that pro-

cess set a standard that will leave their children short. Their bargain may be eminently fair, give all that the children might require and be enforceable · because it is fair. When it gives less than required or less than can be given to provide for the best interest of the children, it falls under the jurisdiction of the court's wide and necessary powers to provide for that best interest. *Id.* It is at best advisory to the court and swings on the tides of the necessity that the children be provided. To which the *inter se* rights of the parties must yield as the occasion requires.

527 Pa. 83, 588· A.2d 503, 505 (1991) (footnotes omitted). In *Knorr,* the Court found it was not bound by the parties' agreement regarding child support payments. *Id.* at 505.

 Equally as important to a child as monetary support, if not more so, is a custody arrangement that meets his or her best interests. Parents are free to enter into agreements regarding custody and visitation.[1] *Miller v. Miller,* 423 Pa.Super. 162, 620 A.2d 1161, 1165–66 (1993). However, a court is not bound by, and may set aside, such agreements. · *Id.* In child custody proceedings, courts are charged with the task of designing a custody arrangement that is in the child's best interest. 23 Pa.C.S. § 5328(a) ("[i]n ordering any

form of custody, the court shall determine the best interests of the child by considering all · relevant factors, giving weighted consideration to those factors which affect the safety of the child"). · The focus is on the child, not the parent. *See id.* Further, it is axiomatic that in child custody and visitation matters, "the paramount concern is the best interests of the child." *J.R.M. v. J.E.A.,* 33·A.3d 647, 650 (Pa.Super.2011) (quoting *Durning v. Balent/Kurdilla,* 19 A.3d 1125, 1128 (Pa.Super.2011)); *see also Dorsey v. Freeman,* 438 Pa.Super. 236, 652 A.2d 352, 353 (1994) (determination of "what will serve the best interests of the child ... may never be subordinated to other considerations such as 'fundamental rights and fair play.'"); *Nonnenman v. Elshimy,* 419 Pa.Super. 597, 615 A.2d 799, 801 (1992) ("in matters of custody and visitation, the ultimate consideration for the court is a determination of what is in the best interest of the child, and all other considerations are deemed subordinate to the child's physical, intellectual, moral, and spiritual well-being"); *Mumma v. Mumma,* 380 Pa.Super. 18, 550 A.2d 1341, 1343 (1988) ("although entitled to be considered, [private custody agreements] must always give way where the best interests of the child suggest an alternate custody arrangement"); *Com. ex rel. Doberstein v.*

---

1. This Court has described the usefulness of private custody arrangements as follows:

 First, most parents genuinely love their children, and it is reasonable to assume that the children's welfare is a vital consideration in the parents' decision to resolve their dispute by agreement. One major reason that parents agree on custody is to spare their children the trauma inherent in an adversarial hearing. Second, parents have a better informational base upon which to make a decision about custody. The adversarial process is an inadequate means to assemble sufficient 'facts' to resolve custodial disputes satisfactorily. Third, it is difficult to protect a child from

 the painful pull of divided loyalties when his parents fail to agree. Parental agreements help to preserve an atmosphere of at least superficial peace between parents and thereby facilitate a much easier and more meaningful future relationship between the child and the non-custodial parent.

 *Miller,* 620 A.2d at 1164 (quoting *Witmayer v. Witmayer,* 320 Pa.Super. 372, 467 A.2d 371, 374–75 (1983)). Accordingly, the policy reasons that courts promote private agreements regarding custody include that the parents are likely to act·in the best interests of the child and that it is in the best interests of the child to have an amicable resolution.

*Doberstein,* 201 Pa.Super. 102, 192 A.2d 154, 156 (1963) ("It is basic and fundamental that the paramount consideration is the welfare of the children and that all other considerations, including the rights of parents, are subordinate to the children's physical, intellectual, moral, spiritual and emotional well[-]being.").[2]

Both the courts and the Commonwealth have a duty to ensure a child's best interests are met by any custody agreement. We have found that it is a court's "responsibility to look to the best interest of the child" and the court's "duty to protect the rights and interests of children" when called upon to determine a custody issue. *Miller,* 620 A.2d at 1164, 1165. Further, the Commonwealth "is charged with the duty of protecting the rights and interests of the children."[3] *Miller,* 620 A.2d at 1165 (quoting *In re Williams L.,* 477 Pa. 322, 383 A.2d 1228 (1978)).

A contractual provision that impedes the trial court's ability to review a custody or visitation arrangement is against public policy and unenforceable. *Cf. Kraisinger v. Kraisinger,* 928 A.2d 333, 345 (Pa.Super.2007) (contract provision invalid where it "penalizes mother for, and therefore would act to discourage her from, seeking a court's review of the parties' agreement as to child support"); *see also Ferguson v. McKiernan,* 596 Pa. 78, 940 A.2d 1236, 1245 n. 16 (2007) (a contract is against public policy where the policy "is so obvi-

ously for or against the public health, safety, morals or welfare that there is a virtual unanimity of opinion in regard to it, that a court may constitute itself the voice of the community in so declaring [that the contract is against public policy].")

The majority attempts to distinguish *Knorr.* It reasons that *Knorr* addressed a child's right to adequate child support payments and, unlike child support payments, any right to custody and visitation belong to a parent, not a child. Majority, at 454–55. However, as stated above, the right of parents to craft a custody arrangement is always subject to the child's right to a custody plan that serves the child's best interests. There is no reason to treat custody actions differently than child support actions, as the goal of both is to ensure that a child's best interests are met. *Miller,* 620 A.2d at 1166 (finding the Supreme Court of Pennsylvania's determination of "court's role in enforcing [child support] agreements equally applicable to custody matters"); *see also Knorr,* 588 A.2d at 508 (noting that when a child support agreement "gives less than required or less than can be given to provide for the best interest of the children, it falls under the jurisdiction of the court's wide and necessary powers to provide for that best interest").

The majority asserts the "issue of whether a provision in a custody/visitation

---

2. A parent has a fundamental right to make "decisions concerning the care, custody, and control of [his or her] children." *In re S.H.,* 71 A.3d 973, 980 (Pa.Super.2013). This does not mean, however, that only a parent has a right to custody and visitation. A parent can lose his or her right if it would not be in the best interest of the child, i.e., the child's right to live in an environment that provides for his or her best interests can outweigh a parent's custody rights. *See id.* ("fundamental right of parents to the care and custody of their children **when that care and custody serves the**

**best interests of the children**" (emphasis provided)).

3. "The source of the state's authority to intervene in family matters to protect minor children has been said to be the doctrine of *parens patriae,* the concept that the sovereign is the father of his country." *In re Williams L.,* 383 A.2d at 1235–36. This authority would not apply to a typical custody arrangement, but it supports the strong public policy of Pennsylvania to promote custody arrangements that are in a child's best interests.

contract that places a serious impediment on either party's ability to seek court modification in the best interest of the child is not presently before this Court." Majority Opinion at 455. It reasons the contract does not provide that the provision is intended to discourage Weaver from seeking intervention or that the payment would act as an impediment to his ability to do so. *Id.* The majority claims whether it would be an impediment would depend on Weaver's ability to pay the $10,000.00 fee. *Id.* The majority notes the contract states Weaver is "an attorney capable of earning a large salary," Weaver recognized the Agreement's terms were "fair, just, and reasonable," and he agreed that he voluntarily executed the agreement. *Id.* The majority further notes that it is unclear whether the parties intended to provide Huss with a defense fund.[4] *Id.* at 456.

The circumstances surrounding the drafting of the provision requiring a $10,000.00 payment are irrelevant to the analysis. Rather, any provision that requires payment to the other party for filing actions or motions to ensure that a child's best interests are met, is unenforceable. Regardless of Weaver's income or his ability to make a "large salary," a provision that would potentially prevent him from filing, or make him question his

ability to file, an action to ensure a child's best interests, is against public policy.[5]

I believe the child's right to a custody arrangement that provides for his or her best interests is paramount, and therefore the contract provision requiring payment of $10,000.00 for any "modification or amendment" to custody or visitation sought is against public policy and unenforceable.

I would find that the trial court did not err and would affirm its order overruling the preliminary objections and dismissing the complaint.

---

4. A statutory right to counsel fees exists where "[a]ny participant ... is awarded counsel fees as a sanction against another participant for dilatory, obdurate or vexatious conduct during the pendency of a matter." 42 Pa.C.S. § 2503(7).

5. That this case is at the preliminary objection stage does not affect my analysis. I believe we must grant prospective relief from a contract provision requiring payment for seeking custody modification. That a party may, at some future date, receive relief from the contractual fee provision, does not alter that the fee provision could deter a person from seeking a custody arrangement that meets a child's best interests. Under the majority's rationale, if Weaver did not have the

$10,000.00, he would be faced with a choice: (1) file a petition, knowing he could not abide by the contract terms, and then be forced to expend additional funds in a breach of contract action to establish that enforcement of the provision acted as an impediment to seeking custody modification in the best interests of the child; or (2) not file a petition to modify custody or visitation because he did not have the funds to pay the fee knowing that the custody arrangement was falling short of meeting the child's best interest. Therefore, such a provision could prevent court review of custody arrangements and allow a child to remain in a custody arrangement that does not meet his or her best interests.